MAYOR AND CITY COUNCIL OF BALTIMORE,
ET AL. *v.* SITNICK, t/a HILTON HOUSE,
ET AL.

[No. 295, September Term, 1968.]

\* \* \*

MAYOR AND CITY COUNCIL OF BALTIMORE,
ET AL. *v.* FIREY, ET AL. t/a CONGRESS
HOTEL COMPANY

[No. 297, September Term, 1968.]

*Decided June 27, 1969.*

304

305

*Motions for rehearing filed July 25 and 28, 1969; denied September 8, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Ambrose T. Hartman, Deputy City Solicitor,* and *Gerald S. Klein, Assistant City Solicitor,* with whom was *George L. Russell, Jr., City Solicitor,* on the brief, for appellants.

*D. Duffy Herman,* with whom were *A. David Gomborov* and *Gomborov, Steinberg & Schlachman* on the brief, for appellees in No. 295.

*Benjamin N. Dorman* for appellees in No. 297.

FINAN, J., delivered the opinion of the Court.

These two appeals [1] were consolidated by the lower court and present the question of the validity of Ordinance Nos. 370, 491, 739 and 1219, now comprising Article 19, Sections 51 through 61 of the Baltimore City Code (1966 Ed.), as amended, enacted by the Mayor and City Council of Baltimore to establish minimum wage standards for certain private employments within the City's jurisdiction.

In both cases the defendants are the City, the members of the City Minimum Wage Commission and the Commission's Executive Director. In No. 295, the plaintiffs are Milton Sitnick, t/a Hilton House, a tavern business in Baltimore City, and Baltimore Licensed Beverage Association, Inc., an organization representing certain tavern owners in the City. There is a tavern exemption in the State law Code (1964 Repl. Vol., 1968 Supp.) Art.

---

1. No. 295 originated as a petition for declaratory judgment in the Superior Court of Baltimore City, and No. 297 originated from a bill of complaint filed in the Circuit Court of Baltimore City. Both suits had as their purpose a challenge to the constitutionality of the Baltimore City Minimum Wage Law.

100, Sec. 82 (e) (11) limited by volume of business; however, taverns are included in the City law. In No. 297, the plaintiffs are Milton J. Firey and Margaret F. Hewitt, partners t/a Congress Hotel Company, which operates a hotel in Baltimore City, and Maryland Hotel and Motor Inn Association, Inc., an organization representing certain hotels and motels in the State of Maryland. Hotels are included in both the City and State laws. However, the municipal wage rate at the time of suit was $1.25 per hour while that of the State was only $1.00. By subsequent enactments these rates have since been changed to $1.40 and $1.30 respectively. Through an invalidation of the City law, the taverns would escape minimum wage regulation entirely, and the hotels would be required to comply with the lower State standard.

Appellee, Sitnick, petitioned the Superior Court of Baltimore City for a declaration that the City law, *inter alia,* conflicted with the State law and was, therefore, void under Article XI-A, Section 3 of the Maryland Constitution. Appellee, Firey, filed a bill of complaint in the Circuit Court of Baltimore City praying a declaratory decree that the City law, *inter alia,* conflicted with the State law and was, therefore, void under both the constitutional provision and the city charter, and that the passage of the State law pre-empted the field of minimum wage regulation. The four ordinances which comprise the City law and its codification, the Rules and Regulations of the Baltimore Minimum Wage Commission and a "comparison schedule" between the City and State minimum wage provisions were attached to the Firey complaint as exihibits. Appropriate injunctive relief was requested in both cases. Although various other issues were raised in each case, only those mentioned were decided by the trial court and raised by this appeal. Maryland Rule 885.

We think a recitation of the legislative chronology helpful towards an understanding of the issues involved.

*December 3, 1964*—Baltimore City Minimum Wage Ordinance (No. 370) was enacted. It created the Mini-

mum Wage Commission to enforce the law and set a minimum wage level at $1.00 per hour for certain employments in the City. Sections 174 to 183 of Article 24 of the City Code (1950 Edition). The declaration of policy and finding of facts contained in Section 174 (now Section 51 of Article 19 of the 1966 Code) were simply that many persons in the City were being paid wages insufficient to maintain a minimal standard of living, that such condition adversely affected their well-being, the general economic and social welfare of the inhabitants of the City, and that legislation was therefore necessary to establish minimum standards.

*April 21, 1965*—Ordinance No. 491 repealed and reordained the City law with amendments.

*May 4, 1965*—Chapter 697 of the Acts of 1965, a public general law applicable uniformly throughout the State, was enacted. It established the State Minimum Wage Law as Article 100, Sections 81-93 of the Maryland Code, empowered the Commissioner of the Department of Labor and Industry to enforce the law, and set a minimum wage level of $1.00 per hour. The declaration of policy and findings of fact contained in Section 81 substantially paralleled those which motivated the City Council.

*June 1, 1965*—Effective date of rules and regulations promulgated by the City's Minimum Wage Commission.

*February 21, 1966*—Ordinance No. 739 repealed and reordained the City law with amendments.

*April 21, 1967*—State law amended by Chapter 393 of the Acts of 1967, including phased increases in the minimum wage to $1.15 and then $1.30 by June 1, 1969.

*December 4, 1967*—Ordinance No. 1219 repealed and reordained the City law with amendments including an increase in the minimum wage to $1.25 per hour with subsequent escalation to $1.40 by September 1, 1968.

*1968*—The General Assembly was silent on the subject of minimum wages.

Judge Albert L. Sklar heard both cases on the City's demurrers, no testimony being taken. At the hearing, the

plaintiffs (appellees) also moved for summary judgment, in the event that the City's (appellant's) demurrers were overruled. The lower court overruled the City's demurrers and rendered a declaratory judgment in favor of the plaintiffs, holding that the Ordinances (known as the Baltimore City Minimum Wage Law) was unconstitutional.

The lower court relying heavily on two fairly recent New York cases, *Wholesale Laundry Board of Trade, Inc. v. City of New York,* 17 A.D.2d 327, 234 N.Y.S.2d 862 (1962) aff. 12 N.Y.2d 998, 239 N.Y.S.2d 128, 189 N.E.2d 623 (1963), and *Wholesale Laundry Board of Trade, Inc. v. New York,* 43 Misc. 2d 816, 252 N.Y.S.2d 502 (Sup. Ct. 1964), aff. 22 A.D.2d 762, 252 N.Y.S.2d 955, aff. 15 N.Y.2d 604, 255 N.Y.S.2d 265, 203 N.E.2d 652 (1964) (cases which we shall discuss later in this opinion), rationalized that the City law was in conflict with the State of Maryland Minimum Wage Act (Code (1964 Repl. Vol.), Art. 100, §§ 81-93),[2] and because of that this was an area of legislative regulation which had been pre-empted by the State of Maryland, the opinion stating:

> "The City argues that there is no fatal conflict between the State and City law and that the Ordinances are supplemental and complementary to the State law. If the enactments of the Ordinances resulted in only additional regulations to the State law, then some would be termed 'supplemental', however, I find that it is clear that there exist many inconsistencies and that there is no hope of reasonable reconcilation between the State law and City law in the areas therein touched upon."

For the reasons which we shall hereinafter relate, we are in disagreement with the decision of the court below.

We start with the recognition of the general proposition that Baltimore City, as a municipal corporation, had

2. Code (1964 Repl. Vol.) Art. 100, §§ 81-93 was filed as a stipulated exhibit.

the authority under its police powers to establish by ordinance minimum wage regulations. *West Coast Hotel Company v. Parrish,* 300 U. S. 379 (1937) ; *Parish Council, Etc. v. Louisiana Highway, Etc.,* 131 So. 2d 272 (La. Ct. App. 1961) ; Art. II, §§ 24 and 27 Baltimore City Charter (1964 Revision). The question is, to what extent was that authority circumscribed, restricted or abrogated by the action of the State moving into this field of legislation and establishing a comprehensive scheme of statewide regulations. A discussion of this question necessarily leads into a consideration of Article XI-A of the Maryland Constitution, the "Home Rule Amendment," [3] measured against the limitations superimposed by the Legislature. *Heubeck v. City of Baltimore,* 205 Md. 203, 208, 107 A. 2d 99 (1954).

The Maryland Constitution, Article XI-A, § 2 provides:

"The General Assembly at its first session after the adoption of this amendment shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the *powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed* under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly." (Emphasis supplied.)

In restricting the exercise of the legislative powers thus granted, Section 3 of Article XI-A provides that

---

3. Article XI-A provides for the manner in which the counties of Maryland or Baltimore City may adopt Charter Home Rule. Baltimore City adopted this form of government in 1918. For the origins of Home Rule in Baltimore City and the granting of extensive police powers to Baltimore City early in the history of this State, see *Pressman v. D'Alesandro,* 211 Md. 50, 56, 57, 125 A. 2d 35 (1956); Thomas, The City Government of Baltimore and 28 Md.L.Rev. 327, 332 (Fall, 1968).

there shall be *no conflict* between the ordinances of the City and the public general laws of the State:

> "\* \* \* All such local laws enacted by the Mayor of Baltimore and City Council of the City of Baltimore \* \* \*, shall be subject to the same rules of interpretation as those now applicable to the Public Local Laws of this State, *except that in case of any conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control.*" (Emphasis supplied.)

In the instant case we are of the opinion that the City law neither conflicts nor is inharmonious with the provisions of the State law, nor conflicts with any intention of the Legislature to reserve to itself the exclusive right to legislate on the entire subject matter, as we shall discuss in this opinion; therefore, the only theory by which the City law would be a nullity or invalid, is on the premise that the presence of the State in this field of regulation amounts to a pre-emption of the field by occupation, with the resulting ouster of local power to legislate. As we read the decisions of our predecessors, this Court has on appropriate occasions followed the doctrine of "concurrent powers" when construing legislative enactments treating on the same subject matter passed by both the State and a political subdivision. At the same time, we are aware that there have been occasions when this Court has recognized the doctrine of pre-emption by occupation. Before proceeding to a discussion of these two theories we deem it helpful to contemplate the political philosophy behind "Home Rule."

One of the objectives of "Home Rule" was to assure to the political subdivisions of the State the power of self-government and freedom from interference, by the Legislature, in the exercise of that power.[4] "Article XI-A

---

4. "\* \* \* The purpose and intent of the legislature in supplying the implementation called for by Art. XI-A by the passage of the express powers Act was to take from the legislature and give

grants to a 'Home Rule' political subdivision full power to enact local laws on the subjects covered by the Express Powers Act and denies the General Assembly power to enact public local laws on such subjects for the county." *Murray v. Director of Planning,* 217 Md. 381, 387, 143 A. 2d 85 (1958); see also *Scull v. Montgomery Citizens League,* 249 Md. 271, 274, 239 A. 2d 92 (1968). However, it is obvious that the Legislature by retaining the power to modify, amend or repeal a provision of a municipal charter and by preserving the dominance of a public general law over local ordinances, in an area where conflict may exist (*Planning Comm. v. Silkor Corp.,* 246 Md. 516, 521, 229 A. 2d 135 (1967)), intended that there be a functional interplay between State and local legislation. There have been times when this has not lent itself to easy solution, although the existence and exercise of "concurrent power" has been recognized with some frequency.[5]

The landmark case in this area, concerning the construction to be followed when there is an overlapping of state and local enactments dealing with the same subject matter, is *Rossberg v. State,* 111 Md. 394, 74 A. 581 (1909), cited in 37 Am. Jur., *Municipal Corporations,* Section 165. In *Rossberg,* the appellant was convicted for violating a Baltimore City ordinance regulating the sale and use of cocaine. The same prohibitions were contained in the State law, but the ordinance provided more severe penalties and enlarged the scope of criminal conduct, be-

to the County the exclusive power to enact local laws, and the reasons for this delegation of power, commonly called home rule, were first to reduce as far as possible the log jam of unacted on measures in the late days of the legislative session in Annapolis which had caused passage of laws that had not received careful scrutiny or due consideration and, second, 'to permit local legislation to be enacted solely by those directly affected by it without interference by representatives from other sections of the State.' *Scull,* p. 274 of 249 Md., p. 94 of 239 A. 2d." *Montgomery Citizens League v. Greenhalgh,* 253 Md. 151, 160, 252 A. 2d 242 (1969).

5. Not to be confused with the "shared power" theory provided by the "Local Government Article" for the mandatory "Home Rule," to have been required of all political subdivisions of the State by 1971, under the proposed Maryland Constitution, § 7.04 (1968).

yond that defined in the statute, by making the mere possession of the drug a misdemeanor. There was no disputing that the subject matter of the ordinance was one regarding which the State had enacted comprehensive regulation and that the ordinance prohibited conduct which the State statute did not prohibit. The Court in upholding the validity of the City ordinance stated:

> "The first inquiry is as to the power of the municipal government of the City of Baltimore to pass the ordinance in question, or, in other words, whether such power has been delegated to it by the Legislature of the State. The powers thus vested in the city are broad and sweeping and are expressed in terms which indicate a liberal view of the need for broad powers for effective local government of a great city. * * *." *Id.* at 410.
>
> * * *
>
> "It follows from what we have thus far said that municipal authorities may be given concurrent power with the State to punish certain offenses, * * *."
>
> * * *
>
> "* * * The true doctrine, in our opinion, is concisely stated in 28 *Cyc.* 701, as follows: 'Such ordinances must not directly or indirectly contravene the general law. Hence ordinances which assume directly or indirectly to permit acts or occupations which the State statutes prohibit, or to prohibit acts permitted by statute or Constitution, are under the familiar rule for validity of ordinances uniformly declared to be null and void. Additional regulation by the ordinance does not render it void.' And when their validity is challenged such ordinances will receive favorable construction, and be sustained by the Court, unless their invalidity clearly appears. *Wyse v. Jersey City Police Commrs.,* 68 N.J.L. 127.

"The reason for this rule is well stated in *Van Buren v. Wells,* 53 Ark. 368, as follows: 'Municipal corporations are in some respects local governments, established by law to assist in the civil government of the country. They are founded in part upon the idea that the needs of the localities for which they are organized, 'by reason of the density of population, or other circumstances, are more extensive and urgent than those of the general public in the same particulars.' * * *." *Id.* at 415-417.

The rationale of *Rossberg* has been buttressed by the opinions of this Court in *American Nat'l Bldg. & Loan Assn. v. Mayor & City Council,* 245 Md. 23, 224 A. 2d 883 (1966); *Mayor & City Council v. Stuyvesant Ins. Co.,* 226 Md. 379, 174 A. 2d 153 (1961); *Herman v. Mayor & City Council,* 189 Md. 191, 55 A. 2d 491 (1947); *Eastern Tar Products Corp. v. State Tax Comm'n,* 176 Md. 290, 4 A. 2d 462 (1939); and *Billig v. State,* 157 Md. 185, 145 A. 492 (1929). Cf. *Heubeck v. Mayor & City Council,* 205 Md. 203, 107 A. 2d 99 (1954); and *Levering v. Park Commr's,* 134 Md. 48, 106 A. 176 (1919), both cases wherein the Court, although finding a conflict between a public general law and a public local law, cited *Rossberg* with favor. See also *Gaither v. Jackson,* 147 Md. 655, 128 A. 769 (1925), wherein the Court in considering the relationship between a public general law and a public local law said, "It may well be that the power could be exercised by both the city and state at the same time. But that need not be decided here." *Id.* at 665.

In *Stuyvesant, supra,* the Legislature imposed comprehensive licensing and regulatory provisions upon corporate sureties doing business in this State. Code (1968 Repl. Vol.) Art. 48A, Sec. 43, expressly pre-empted the field by denying local governments the power to require any additional licenses. The statute, however, did not regulate non-corporate sureties. Baltimore City enacted an ordinance regulating and requiring a license of any-

one engaging in the bail bond business within the City. This Court held that the City possessed concurrent police powers in the field and that its regulations concerning non-corporate sureties would survive, although the ordinance failed in respect to those parts in conflict with the State statute.

In *Eastern Tar Products Corp., supra,* this Court upheld a Baltimore City ordinance which tightened the procedure for the filing of tax exemptions for manufacturers, over and above that required by the public general law, stating:

> "* * * As stated in 43 C. J. 219, in reference to the subject of municipal ordinances, 'As a general rule, additional regulation to that of the state law does not constitute a conflict therewith. The facts that an ordinance enlarges upon the provisions of a statute by requiring more than the statute requires creates no conflict therewith. *Rossberg v. State,* 111 Md. 394, 74 A. 581.'" *Id.* at 296-297.

The most recent expression of this Court on concurrent regulatory authority is found in *American National, supra,* wherein the appellants contended that the Legislature by enacting comprehensive regulations covering the savings and loan industry had, by occupation, preempted the field so as to foreclose the power of political subdivisions to place a tax on the industry in addition to that prescribed by the State statute. This Court in rejecting the "pre-emption" concept adopted a cogent excerpt from Judge Prendergast's opinion in the nisi prius court wherein he stated:

> " 'It would appear that the tests of general laws was devised, not to draw an impermeable line between the authority of the City and the State, but rather merely to define the inclusive limits of the State's powers. *'General'* under this test merely means that the subject is of suffi-

*cient statewide effect to give the State authority
to legislate. It does not mean that it is not of
sufficiently local effect to give the City at least
concurrent power to legislate.* The associations
contend, in effect, that what is not a local law as
far as the State is concerned cannot be a local
law insofar as the City is concerned, i.e., that
'general' and 'local' are absolute terms and mu-
tually exclusive. The Court of Appeals has never
adopted this theory, but on the contrary, ad-
mitted in *Gaither* [supra] the possibility of con-
current power. Loyola [Federal Savings and
Loan Association] recognizes this possibility and
counters it with the unconvincing argument that
for something to be treated by both City and
State simultaneously, it must be capable of di-
vision on a reasonable basis (e.g. difference of
condition) in order to support that difference in
treatment. The associations contend that the
non-localized character of the savings and loan
associations does not come within the test.
Therefore since the tax is general within this
test devised for the State and cannot be made di-
visible, it cannot be local as being within the
City's power to enact. This argument fails be-
cause, as the City Solicitor notes, the tax is im-
posed only on business within or fairly allocable
to the City, and to that extent there is a rea-
sonable basis for local taxing power, even if a
similar tax by the State would be general and
within the power of the Legislature.' " (Em-
phasis supplied in original) *Id.* at 31, 32.

Consonant with this Courts' opinion in *American Na-
tional, supra,* is the following excerpt from 37 Am. Jur.
*Municipal Corporations,* § 165, citing *Rossberg,* which
provides:

"The mere fact that the state, in the exercise
of the police power, has made certain regula-

tions does not prohibit a municipality from exacting additional requirements. So long as there is no conflict between the two, and the requirements of the municipal bylaw are not in themselves pernicious, as being unreasonable or discriminatory, both will stand. *The fact that an ordinance enlarges upon the provisions 'of a statute by requiring more than the statute requires creates no conflict therewith, unless the statute limits the requirement for all cases to its own prescription.* Thus, where both an ordinance and a statute are prohibitory and the only difference between them is that the ordinance goes further in its prohibition, but not counter to the prohibition under the statute, *and the municipality does not attempt to authorize by the ordinance what the Legislature has forbidden or forbid what the legislature has expressly licensed, authorized, or required,* there is nothing contradictory between the provisions of the statute and the ordinance because of which they cannot co-exist and be effective. *Unless legislative provisions are contradictory in the sense that they cannot co-exist, they are not deemed inconsistent because of mere lack of uniformity in detail."* (Emphasis supplied.)

A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted. Stated another way, unless a general public law contains an express denial of the right to act by local authority, the State's prohibition of certain activity in a field does not impliedly guarantee that all other activity shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation.

As we stated early in this opinion, there have been occasions when this Court has given its sanction to the

"pre-emption" concept. We think, however, that those instances can be reconciled with the "concurrent power" theory followed in the cases previously cited. In *Bowie v. Wash. Sub. San. Comm'n*, 249 Md. 611, 241 A. 2d 396 (1968), the Court was not confronted with the question of whether a public local law conflicted with a public general law covering the same subject matter, but whether the authority of the Town of Bowie to construct its own sewerage system was independent of and paramount to the authority of the Washington Suburban Sanitary District of which it was a part. Bowie contended that "* * * Sec. 6 of Art. XI-E of the Constitution of Maryland, read with Art. 23A of the Code, put it beyond the control of the Commission, and if it is wrong on this that the provisions of the Sanitary Facilities Bond Act of 1957 (§§ 428 to 444 of Art. 43 of the Code) establish beyond question that a municipality which avails itself of the provisions of that act can walk alone, ignoring the Commission." *Id.* at 614. Chief Judge Hammond writing the opinion for this Court, in affirming the lower court's refusal to issue a mandamus to compel the Commission to grant the building permit, stated:

> "We think it would be so unlikely that the legislature intended in 1957 to authorize a municipality within the Washington Suburban Sanitary District to build a sewerage system when the Commission was prepared to build as good or a better system, that it would be unreasonable to read the words of § 442 in isolation (as they can be) as meaning that the Commission was stripped of its long-granted powers. Rather, we read the broad paramountcy given the provisions of the Sanitary Facilities Bond Act of 1957 as overruling laws which prevented or hindered municipalities in providing sanitary facilities for their citizens, not laws which offer those facilities."

> . * * *

> "Judge Mathias' declaration that the Com-

mission had statutory paramountcy in the area involved will be affirmed, * * *." *Id.* at 618-619.

*Bowie* does not rest on the doctrine of pre-emption of a field by occupation but primarily concerns the method of procedure to be followed when a local subdivision sought to avail itself of State enactments to construct a public service facility.

In *State v. Gibson,* 4 Md. App. 236, 242 A. 2d 575 (1968), the Court of Special Appeals in construing the application of Article 27, Section 388, in a case involving the question of manslaughter by motor vehicle, in relation to involuntary manslaughter at common law stated:

"* * * We conclude, therefore, that in enacting Section 388, the Legislature intended to deal with an entire subject matter — unintended homicides resulting from the operation of a motor vehicle—and that the common law crime of involuntary manslaughter, when based on homicides so occurring, is in conflict with the statute and must yield to it to the extent of the inconsistency. See *Lutz v. State,* 167 Md. 12. We observe in this connection that in enacting Section 388, the Legislature expressly provided (Section 2 of Chapter 414 of the Acts of 1941) that 'all acts inconsistent with the provisions of this Act are repealed to the extent of such inconsistency.' " *Id.* at 247.

Here again, the Court was not presented with the situation where a public local law and a public general law were in conflict but rather the court was endeavoring to give direction in a field where there had been some confusion concerning the intendments of the common law in an area complicated by the developments of modern times. It should also be noted that the statute in question contained a provision repealing all acts inconsistent therewith to the extent of the inconsistency.

In *Swann v. M. & C. C. of Baltimore,* 132 Md. 256, 258-

259, 103 A. 441, 442 (1918), a case cited by the appellees, this Court upheld a Baltimore City Ordinance regulating the operation of motor cars and hacks for hire, under powers derived from a public local law enacted by the State Legislature finding that it superseded a prior city ordinance on the same subject. Again, we do not think this is a true case of State pre-emption by occupation of the field. The Court in *Swann*, cites and appears to rely upon *State v. Gambrill*, 115 Md. 506, 81 A. 10 (1911), a case which is a leading authority on the doctrine of repeal by implication. There is also in *Swann*, the standard clause repealing all inconsistent laws.

Certainly there is nothing in the rationale of *Bowie*, *Gibson* or *Swann*, to support the conclusion that this Court has turned aside the "concurrent power" theory.

Labels are ofttimes misleading and one may easily fall into error by superimposing a classification upon decisions of a foreign jurisdiction; however, it would appear that in addition to New York, that California, Massachusetts, Ohio, Oklahoma, North Carolina and Illinois have followed the "pre-emption" concept.[5] Despite this formidable alignment, we deem it best in the case before us to adhere to the "concurrent power" theory.

M. Peter Moser, Esq. of the Baltimore City Bar, has written an excellent article entitled, "County Home Rule —Sharing the State's Legislative Power With Maryland Counties," 28 Md.L.Rev. 327, (Fall 1968), wherein the "concurrent power" theory as developed in the Maryland decisions is discussed, together with a criticism of the interpretation of the Maryland law as rendered by the lower court in the case at bar. After discussing in some detail the Maryland cases on this point, including the

---

5. In Re Lane, 372 P. 2d 897 (Cal. 1962); *Tolman v. Underhill*, 249 P. 2d 280 (Cal. 1952); *Pipoly v. Benson*, 125 P. 2d 482 (Cal. 1942); *Dudley v. City of Cambridge*, 199 N.E.2d 208 (Mass. 1964); *Markowski v. Backstrom*, 226 N.E.2d 825 (Ohio 1967); *7-Eleven Inc. v. McClain*, 422 P. 2d 455 (Okla. 1967); *Staley v. City of Winston-Salem*, 128 S.E.2d 604 (N. C. 1962); *West Chicago Street R. R. Co. v. Ill.*, 201 U. S. 506, 521 (1906).

*Firey* case (the case at bar), the author reached the following conclusion:

> "* * * No Maryland case has invalidated a local ordinance as conflicting with a state law because the local ordinance prohibited an activity permitted by the state, except where the state law *expressly* permitted the activity. *Heubeck* and *Stuyvesant* involved such an express permission in a state law with which the local ordinance prohibiting the action conflicted; therefore the Court of Appeals held invalid the conflicting ordinance. The *Firey* decision thus goes further in striking down a local regulatory ordinance than any decision of the Court of Appeals. Moreover, the city ordinance does not conflict with the state law, because the ordinance seeks to accomplish precisely the same purpose as does the state law, namely, to prohibit the payment of substandard wages. The higher cost of living and more severe substandard housing problems in the city justify additional city regulations by setting a higher minimum wage, in the same way as additional limitations were permitted in *Stuyvesant, Billig* and *Rossberg* on the basis that the state and city might act concurrently on the subject matter. *See American National, supra;* note 49 *supra.*" *Id.* at 350, Note 79. (Emphasis in original.)

As we have already stated, the lower court followed the rationale of two New York cases and emphasized particularly its reliance on the first New York case, *Wholesale Laundry Board of Trade, Inc. v. City of New York,* 17 A.D.2d 327, 234 N.Y.S.2d 862 (1962). There is no doubt as to the theory upon which the New York case is predicated and by reference adopted by the lower court, namely, the "pre-emption" theory, as the New York Court stated:

> "Furthermore, it is entirely clear that the

state law indicates a purpose to occupy the entire field. And where that is found, local laws are prohibited (*People v. Lewis, supra,* 295 N. Y. at 51, 64 N.E.2d at p. 704). * * *." 234 N.Y.S.2d 862 at 865.

We think it significant to note that the New York Court was presented with a state statute which provided for administrative machinery whereby the State Commissioner could adjust the minimum wage to adapt to local conditions thereby diminishing the justification for local regulation, a provision nowhere to be found in the Maryland law. We also note that the affirmance of the first New York case by the Court of Appeals, at 239 N.Y.2d 128 (1963) was by a 4-3 split decision. Judge Dye, in a strongly worded dissent, rejecting the preemption concept as applied to that case, stated:

"* * * It may not be said that the State has pre-empted the field simply because the State law is State-wide in its application, particularly when it does not forbid enactment of a local law such as this." *Id.* at 129.

A review of the chronology of the legislative enactments in the case at bar undermines the argument that the Legislature intended to pre-empt the field of minimum wage regulation. The Legislature in passing its first law made no mention whatever of the City law already in force. It included no repealer of the City law nor, as a matter of fact, the standard clause repealing all inconsistent laws. When the Legislature acted, for the second time, in this field the City law was not only still in effect but had been repealed and reordained with amendments. There is a presumption of statutory construction that the Legislature acts with the knowledge of existing laws on the subject matter under consideration. *Planning Comm. v. Silkor Corp.,* 246 Md. 516, 524, 525, 229 A. 2d 135 (1967) ; *Bell v. State,* 236 Md. 356, 368, 204 A. 2d 54 (1964).

Before leaving the discussion of the concept of "pre-

emption" in the field by occupation, as contrasted with the "concurrent power" theory, we wish it understood that there may be times when the legislature may so forcibly express its intent to occupy a specific field of regulation that the acceptance of the doctrine of pre-emption by occupation is compelled, but we do not find it in this case. The need for caution in the application of this doctrine is cogently set forth by Mr. Moser in his article when he states:

> "* * * The rule as applied at the state-local level means that the mere existence of a single statute in a general field precludes local legislation on some specific subject in the field if the court finds, without any legislative expression, that the legislature intended to establish a basic policy or scheme. *Carried to this extreme, pre-emption would place units of local government in a vise and render worthless any form of home rule, including shared powers home rule. Probably the best arrangement is that developed in Maryland.*" 28 Md.L.Rev. 327, 351, n. 80. (Emphasis supplied.)

Finally, the lower court in its opinion stated that it found a fatal conflict and numerous inconsistencies between the State law and the City law, and set forth some 14 areas in which the purported conflicts arise. In discussing the conflict question we are referring to the issues raised by the specific conflicts of the various provisions of the two laws and not the broad issue of whether the City law conflicted with any intention of the Legislature to reserve to itself the exclusive right to legislate on the entire subject matter. We feel that we have already answered this latter issue, in the negative, in our previous discussion of the doctrine of "concurrent powers." However, with regard to the specific conflicts which the appellees contend exist between various provisions of the City law, when compared with the State law, we find that the purported conflicts properly lend themselves

to the characterization of supplementation of the State law, rather than irreconcilable differences.

The lower court in its opinion reasoned that it was the legislative intent, that where the State law created an exemption, it intended by specific exclusion to free those businesses in the excluded categories from any regulation, and it meant this privilege to extend to freedom from regulation by local law. However, we are of the opinion that the more logical deduction is that the State exemption amounts to no regulation at all and accordingly leaves the field open for regulation at the local level. We do not think in this case that the exemption from State regulation, unaccompanied by any prohibition against inclusion in local legislation, was an affirmative guarantee against local regulation. Furthermore, to adopt a contrary rule in this instance would create the anomalous situation whereby the City's concurrent power to regulate would become operative only in the event that the State set a minimum standard which the City would supplement.

The City further contended, that since the only issue involving the interests of the tavern owners was the basic question of their inclusion in the City law, all of the other areas of conflicts presented by the appellees were purely abstract propositions and that as to them the City's demurrer should have been sustained. In *Queen Anne's County v. Miles,* 246 Md. 355, 362, 228 A. 2d 450 (1967), we said that "constitutional rights are not to be determined abstractly under the Declaratory Judgment Act or otherwise." However, we do not deem it necessary to decide the pertinency of this question to the instant case, for the reason that, assuming, arguendo, the appellees' interests were affected by the purported conflicts, as we have already stated, we find them to be supplemental in character. In none of the provisions of the listed conflicting regulations of the City law does it authorize a minimum wage which is lower than that provided by the State law, nor does it exempt any employees included under the State law; we think this is the crucial norm which

must be used to measure the City law regarding any conflict with the statute.

The City in its brief uses the "Brandeis" technique, with statistical documentation supporting the economic justification for a minimum wage law in Baltimore City, and the appellees counter with a critical editorial comment from the "Baltimore Evening Sun," Sept. 28, 1968. It is not within the purview of the functions of this Court to weigh the wisdom of the legislation, as long as we are content that the subject matter comes within the ambit of those activities of public concern upon which the municipal government of Baltimore City may exercise legislative power.

Professor McQuillin in his treatise, 6 *Municipal Corporations* (3rd Ed.), § 24.44 stresses the broad scope of action which the delegation of a "general welfare" power by a Legislature to a political subdivision encompasses, stating:

> "* * * The cases, indeed, reveal an increasing judicial inclination under such a clause to accord to municipal authorities wider discretion in the reasonable and nondiscriminatory exercise, in good faith, of the police power in the public interest. While under the clause, or under the guise of it, personal and property rights recognized by general law and guaranteed by organic provisions cannot unreasonably be restrained, courts uniformly regard the clause as ample authority for a reasonable exercise, in good faith, of broad and varied municipal activity to protect the health, morals, peace and good order of the community, to promote its welfare in trade, commerce, industry and manufacture, and to carry out every appropriate object contemplated in the creation of the municipal corporation. * * *."

See also *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 252 A. 2d 242 (1969).

The opinion of the lower court filed September 26, 1968, covering both cases and the order filed on October 4, 1968, in No. 295 and on October 8, 1968, in No. 297, taken together, are in the nature of declaratory judgments in favor of the plaintiffs (appellees) in both cases. In view of what we have stated in this opinion we are reversing the order of the court in both cases and remanding them for the passage of a judgment in both cases declaring the City Ordinance Nos. 370, 491, 739 and 1219 (The City Minimum Wage Law) to be valid.

> *Orders reversed, cases remanded for the passage of a judgment declaring the city minimum wage ordinances to be valid. Appellees to pay costs.*