Gen. 81]                                                                 81

## TRANSPORTATION

**LOCAL GOVERNMENT – PREEMPTION – TRAFFIC STOPS – WHETHER A LOCAL ORDINANCE PROHIBITING LOCAL POLICE OFFICERS FROM STOPPING DRIVERS SOLELY FOR CERTAIN TRAFFIC OFFENSES WOULD BE PREEMPTED BY THE MARYLAND VEHICLE LAW**

September 15, 2023

*The Honorable Evan Glass*
*President, Montgomery County Council*

The Maryland Vehicle Law—the State statute regulating the use of motor vehicles—defines numerous offenses for which police officers may issue traffic citations. Motor vehicle offenses can be categorized as either "primary" or "secondary." If a police officer observes a *primary* offense, they may ordinarily stop and cite the driver for that offense, without more. But an officer cannot stop a driver for a *secondary* offense standing alone. Instead, an officer may issue a citation for a secondary offense only after stopping the driver for a separate primary offense. A bill pending before the Montgomery County Council—the Safety and Traffic Equity in Policing Act, or "STEP Act"—would require Montgomery County police officers to treat certain traffic offenses as secondary, even though the Maryland Vehicle Law has not defined them as such. The STEP Act would also limit Montgomery County officers' ability to ask for consent to search a vehicle, or its occupants, during a traffic stop.

On behalf of the Montgomery County Council, you requested an opinion of the Attorney General on whether the Maryland Vehicle Law would preempt the STEP Act. In accordance with our policy on opinion requests, you provided a memo from the County Attorney concluding that the Vehicle Law would preempt the provisions of the STEP Act relating to secondary offenses but that the STEP Act's remaining provisions would be valid. You also provided a memo from a Legislative Attorney for the Council, concluding that the Vehicle Law would not preempt any portion of the STEP Act.

In our view, the Vehicle Law would expressly preempt the STEP Act's provision designating certain traffic offenses as secondary. Under the Vehicle Law, no local government may make or enforce a "local law, ordinance, or regulation on any subject covered by the Maryland Vehicle Law." Md. Code Ann.,

Transp. ("TR") § 25-101.1(b)(3).  As we will explain, the Maryland Vehicle Law covers the subject of which motor vehicle offenses are subject to primary enforcement and which are subject to secondary enforcement.   More specifically, the Vehicle Law establishes a general rule that all motor vehicle offenses are subject to primary enforcement.  It then exempts certain specific offenses from that rule, explicitly providing secondary enforcement for those specific offenses.  Because the Vehicle Law addresses the subject of primary versus secondary enforcement, and because the General Assembly has chosen to designate certain offenses as secondary while leaving the rest as primary, a local law designating further offenses as secondary would address a subject that the Vehicle Law covers and would thus be preempted.

Although the Vehicle Law reserves certain powers to local governments, none of those reserved powers would authorize the secondary-offense provisions of the STEP Act.  To be clear, we do not question a local government's general authority to establish rules for its own police department.  Nor do we address a local legislative body's ability to set enforcement priorities for its local police department in areas *not* subject to express preemption.  We conclude only that, whatever legislative authority a local government otherwise has, the General Assembly has overridden that authority for subjects the Vehicle Law addresses, including the subject of which motor vehicle offenses are secondary.

On the other hand, the Vehicle Law would *not* preempt the STEP Act's remaining provisions.  In particular, the Vehicle Law would not preempt the STEP Act's limitation on consent searches.  That provision would preclude an officer from requesting consent to search a vehicle or its occupants during a traffic stop, unless there is at least reasonable suspicion to believe a crime has been committed.   The Maryland Vehicle Law does not address the subject of searches during traffic stops.   The consent-search provision also would not tread on an impliedly preempted field.  Nor would it conflict with any provision of the Vehicle Law, because, again, the Vehicle Law does not address searches.  There is thus no basis to say that the Vehicle Law would preempt the consent-search provision.[1]

---

[1] We received three sets of comments on this opinion request, generally supporting the STEP Act on legal or policy grounds.  Angela J. Davis et al., *Testimony in Support of the Safety and Traffic Equity in Policing (STEP) Act—Bill 12-23* (July 5, 2023) ("Davis Comments"); Robert Landau, *Comments of Robert Landau on the Legality of the Montgomery County Bill 12-23* (July 25, 2023); Letter from Chelsea J.

## I
## Background

### A.   *Traffic Stops*

Traffic stops are the most common interaction between police officers and members of the public in the United States. Montgomery County Office of Legislative Oversight, OLO Report No. 2021-10, *A Study on Reassigning Traffic Enforcement from the Montgomery County Police Department to the Montgomery County Department of Transportation* 5 (2021) ("OLO Report"). Maryland law empowers police officers to order a driver to stop by means of a "visual or audible signal." TR § 21-904. Because the driver, once pulled over, is not free to leave at will, a traffic stop is a "seizure" governed by the Fourth Amendment and Article 26 of the Maryland Declaration of Rights.[2] *See, e.g.*, *Byndloss v. State*, 391 Md. 462, 465 & n.1, 480 (2006). Ordinarily, though, an officer can conduct a traffic stop without a warrant if they have reasonable suspicion—usually through direct observation—that the driver is violating the motor vehicle laws. *State v. Williams*, 401 Md. 676, 690-91 (2007). Indeed, the Maryland Vehicle Law affirmatively authorizes officers to issue citations for motor vehicle offenses, which in turn implies the power to stop the driver. *See* TR § 26-201. For some specific offenses, though, the authority to conduct a stop is limited by statute, as we discuss further below.[3]

---

Crawford, Esq., to Hon. Anthony G. Brown, Attorney General (Aug. 10, 2023). We thank the commenters for their views, and we have considered their comments in developing the analysis below.

[2] Article 26 provides: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." Md. Decl. Rights Art. 26. The scope of Article 26's protection against searches and seizures is generally the same as the Fourth Amendment's. *See, e.g.*, *King v. State*, 434 Md. 472, 482-83 (2013).

[3] While the default rule is that motor vehicle offenses in Maryland are misdemeanors, *see* TR § 27-101, some are felonies, *e.g.,* TR § 20-102(c)(3) (leaving the scene of an accident when the defendant knew or reasonably should have known that the accident resulted in serious bodily injury or death), and others are subject only to civil penalties, *e.g.*, TR § 21-1414(c) (failing to pay a toll assessed by a video monitoring system). We do not consider the question of when an officer can stop a driver who has committed only a civil offense.

Constitutional limits also control what the officer can do once the driver has been stopped. A stop generally cannot last longer than necessary to accomplish its original purpose, which is normally to investigate the traffic violation and issue a warning or citation if appropriate. *See, e.g.*, *Ferris v. State*, 355 Md. 356, 372 (1999). But an officer may continue to detain the vehicle if the officer has reasonable suspicion that some other criminal activity is afoot. *Id.* And an officer may also request consent to search the vehicle or its occupants. *See id.*; *Scott v. State*, 247 Md. App. 114, 132, 150-52 (2020). A warrantless search based on consent is ordinarily valid with or without reasonable suspicion or probable cause, even in the context of a traffic stop. *See State v. Green*, 375 Md. 595, 609-10 (2003); *Gamble v. State*, 318 Md. 120, 123-24 (1989). *But see* Md. Code Ann., Crim. Proc. ("CP") § 1-211(c) (providing that evidence obtained through certain cannabis-related searches is inadmissible even if obtained with consent).[4]

Traffic stops serve an important public safety function. They enable officers to deter and stop dangerous driving, which in turn helps reduce crashes and injuries. OLO Report at i, 5. But advocates and researchers have raised concerns about racial disparities in the frequency of traffic stops, especially in the frequency of traffic stops where the officer's primary motivation is to search for evidence of other crimes. *Id.* at 76-77. Such "investigatory" stops have been upheld against Fourth Amendment challenge by the United States Supreme Court, *see Whren v. United States*, 517 U.S. 806, 813 (1996), but are often criticized as "pretextual," *see, e.g.*, Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1852-61, 1902-03 (2004); *Snyder v. State*, No. 1127, Sept. Term, 2021, 2023 WL 1497289, *8-*10 (Md. App. Ct. Feb. 3, 2023) (unreported) (Friedman, J., concurring) (criticizing *Whren* and arguing that the Supreme Court of Maryland should adopt a rule against "pretextual" stops under Article 26 of the Declaration of Rights).[5]

---

[4] Other exceptions to the warrant requirement, such as the "plain view" exception or the "automobile exception," may apply in the context of a traffic stop. *See Livingston v. State*, 317 Md. 408, 412-13 (1989); 107 *Opinions of the Attorney General* 153, 162-63, 166 n.20 (2022). However, because the STEP Act does not address these exceptions, we need not discuss them here.

[5] As the law professors' comments to our Office put it, "some police officers use traffic stops to racially profile black and brown drivers. They use traffic stops as a pretext for stopping these drivers so they can look inside their cars and ask for consent to search, even though they

Research indicates that Black and Latino drivers are stopped at higher rates than white drivers for "minor" or "technical" offenses (i.e., those that do not directly threaten a crash or injury). OLO Report at 76-77 & nn.4-6 (citing social science literature). And such "technical" violations are the most common basis for "investigatory" stops. *See id.* The concern, then, is that police freedom to conduct traffic stops for "technical" violations is a major source of racial disparity in traffic enforcement.

In Maryland, 125 law enforcement agencies conducted more than 482,000 traffic stops in 2021. *See* Governor's Office of Crime Prevention, Youth, and Victim Services, Race-Based Traffic Stop Data Dashboard, https://goccp.maryland.gov/data-dashboards/traffic-stop-data-dashboard/ (enter "2021" for "Year") (last visited Sept. 12, 2023) ("Data Dashboard"). There are several law enforcement agencies with the power to make traffic stops in Montgomery County (or at least parts of the County), including the Montgomery County Police Department ("MCPD"), the Maryland State Police, the Montgomery County Sheriff's Office, and municipal police departments. *See id.;* OLO Report at 13 n.17. Because some of these agencies are created by local law as arms of local government, the question arises whether local governments can regulate the ability of their police departments to make traffic stops. The answer to that question depends on the preemptive scope of the Maryland Vehicle Law.

## B. *The Maryland Vehicle Law*

The Maryland Vehicle Law (Titles 11 through 27 of the Transportation Article, Maryland Code) regulates motor vehicle ownership and operation in the State. Its purpose is to ensure "that traffic shall move smoothly, expeditiously and safely [and] that no legitimate user of the highway . . . shall be killed, injured or frustrated in such use by the improper behavior of others." Uniform Vehicle Code vii (National Comm. on Unif. Traffic Laws & Ordinances 1968 rev.); *see also* Committee to Study Revision of the Motor Vehicle Laws, *Proposed Revision of the Motor Vehicle Laws of the State of Maryland* iii (1968) (explaining that most recent substantive revision of the Vehicle Law was based on the Uniform Vehicle Code).

The Vehicle Law expressly limits the lawmaking authority of local governments. "Except as otherwise expressly authorized . . .

---

have no legal grounds to suspect them of criminal behavior." Davis Comments at 2.

no local authority or political subdivision of this State may . . . make or enforce any local law, ordinance, or regulation on any subject covered by the Maryland Vehicle Law." TR § 25-101.1(b)(3). The statute then reiterates that "[t]he provisions of the Maryland Vehicle Law prevail over all local legislation and regulation on any subject with which the Maryland Vehicle Law deals." TR § 25-101.1(c)(1). At the same time, the Vehicle Law grants certain express powers to local governments, including the power of "[r]egulating traffic by means of police officers or traffic control devices," TR § 25-102(a)(2), and of "regulating or prohibiting the stopping, standing, or parking of vehicles," TR § 25-102(a)(1).

The General Assembly enacted the earliest precursor of the Vehicle Law in 1904, just a few years after the first automobiles appeared in Maryland. 1904 Md. Laws, ch. 518; *see also Carriage Without Horses*, Balt. Sun, Dec. 20, 1898, at 10 (announcing the expected arrival in February 1899 of the first "horseless carriage" in Baltimore). As cars proliferated, the rules governing them grew more complex, and legislators became more interested in ensuring statewide uniformity. In 1916, the General Assembly prohibited local governments from establishing their own speed limits, licensing or registration requirements, or motor vehicle taxes. 1916 Md. Laws, ch. 687. But State authorities soon decided stronger preemption was needed. In 1927, the General Assembly expressly preempted local lawmaking on any subject covered by the State vehicle law.[6] That preemption provision remains in effect, with

---

[6] As originally enacted, the preemption provision read:

> Except to the extent that they may be specifically authorized by other provisions of this sub-title [Article 56, Subtitle "Motor Vehicles"], no city, county or other political sub-division of this State shall have the right to make or enforce any ordinance or regulation upon any subject for which provision is made in this sub-title. The provisions of this sub-title (except as herein otherwise specifically provided), are intended to be exclusive of all local and municipal legislation or regulations, upon the various subjects with which this sub-title purports to deal, and all public local laws, ordinances and regulations, inconsistent or identical therewith, or similar or equivalent thereto, are hereby repealed; and the charters of all municipal corporations of this State are hereby modified so as to prohibit such corporations from making or enforcing any

only limited changes, as today's TR § 25-101.1.  Former Attorney General Thomas H. Robinson, who drafted the preemption statute, explained that it was intended to "remove all doubt . . . and to make it clear that the provisions of the general motor vehicle law were exclusive of all public local laws and municipal ordinances and regulations, covering the same subject matter."  14 *Opinions of the Attorney General* 210, 214 (1929).

The General Assembly apparently had second thoughts about the preemption provision's breadth.  In 1929, it amended the preemption language to recognize local governments' authority to adopt "reasonable traffic regulations" notwithstanding the State law.  1929 Md. Laws, ch. 319.  But in 1943, as part of a general substantive revision of the Vehicle Law, the General Assembly repealed that exception, restoring the preemption provision to its 1927 scope.  1943 Md. Laws, ch. 1007.

There have been two comprehensive revisions of the Vehicle Law.  Each has drawn on the Uniform Vehicle Code developed by the National Committee on Uniform Traffic Laws and Ordinances.  The first revision, in 1943, aimed at "promoting greater uniformity and thereby achieving greater safety."  *Report of the Commission on the Revision of the State Motor Vehicle Laws* 8 (1942) ("1942 Report").  As mentioned, this revision (among other changes) repealed the authority of local governments to adopt "reasonable traffic regulations."  At the same time, the General Assembly codified a list of express powers of local governments, drawn from the Uniform Code.  These included the power of "[r]egulating traffic by means of peace officers or traffic control devices" and "[r]egulating the standing or parking of vehicles."  *Compare* 1943 Md. Laws, ch. 1007 (enacting Art. 66 ½, § 135), *with* Uniform Vehicle Code, Uniform Act Regulating Traffic on Highways § 28, at 5 (Nat'l Conference on Street & Highway Safety 1938 rev.); *see also* 1942 Report at 2.

The second revision, in 1970, made no substantive changes either to the preemption provision or to the two express powers mentioned above.  1970 Md. Laws, ch. 534 (enacting Art. 66 ½, §§ 15-101, 15-102); *see also* Maryland Dep't of Motor Vehicles, *Motor Vehicle Laws Revision* 495-98 (1969) (comparing newly

---

ordinance or regulations in violation of this section.

1927 Md. Laws, ch. 520, § 3 (codified as Art. 56, § 171-A).

revised sections to prior law).[7] Finally, a non-substantive code revision in 1977 adopted the current section numbering, codifying the preemption provision at TR § 25-101.1 and the list of local powers at TR § 25-102. 1977 Md. Laws, ch. 14.

## C. *Primary and Secondary Offenses*

As discussed above, officers ordinarily have broad authority to stop drivers for motor vehicle violations. *Williams*, 401 Md. at 690-91. And a driver's consent to a search can be voluntary even if obtained during a traffic stop. *Green*, 375 Md. at 614-15. But legislators can impose stricter limits on searches and seizures—including traffic stops—than the Constitution (State or federal) requires. *See* 107 *Opinions of the Attorney General* 153, 189-90 (2022) (concluding that, even if vehicle searches based on the odor of cannabis would be constitutional, the General Assembly could prohibit such searches); *see also* CP § 1-211 (limiting law enforcement officers' authority to conduct stops and searches based solely on the odor of cannabis).

One potential statutory limit on officers' authority to stop vehicles is the designation of certain motor vehicle offenses as "secondary." A secondary violation is conduct that, although unlawful, does not—by itself—allow an officer to initiate a traffic stop or issue a citation. *See, e.g.*, Christi Schofield, Comment, *Texas, Are We There Yet?*, 15 Tex. Tech Admin. L.J. 399, 410 (2014) (discussing status of texting while driving as a primary or secondary offense). The officer may only issue a citation for a secondary offense if they have already stopped the driver for a "primary offense" (meaning any offense that has not been designated as secondary). *Id.*

The Maryland Vehicle Law expressly designates certain traffic offenses as secondary offenses. For example, the Vehicle Law prohibits driving "with any object, material, or obstruction hanging from the rearview mirror that interferes with the clear view of the driver through the windshield." TR § 21-1104(c)(3). But a

---

[7] The 1970 version retained prior language providing local governments power to "[r]egulat[e] the standing or parking of vehicles" even though the most recent Uniform Vehicle Code revision referred to "[r]egulating or prohibiting *stopping*, standing or parking." Uniform Vehicle Code § 15-102(a)(1) (1968 rev.) (emphasis added). The word "stopping" was later added to the Maryland provision as part of non-substantive code revision in 1977; the Revisor's Note stated that its omission had been an "oversight." 1977 Md. Laws, ch. 14 (Revisor's Note to TR § 25-102).

"police officer may enforce this [prohibition] only as a secondary action when the police officer detains a driver of a motor vehicle for a suspected violation of another provision of the Code." TR § 21-1104(c)(3)(ii). The Vehicle Law also establishes secondary-offense status for driving with a partly obscured license plate, TR § 13-411(c), violating passenger restrictions on provisional license holders, TR § 21-1123, driving without headlights in rainy conditions, TR § 22-201.2, and failure to wear a seatbelt by a passenger over 16 in the back seat, TR § 22-412.3(c)(3). All of these remain traffic violations, but they do not, standing alone, provide a basis for an officer to stop a vehicle or cite a driver.

## D. The STEP Act

The STEP Act is a bill pending before the Montgomery County Council. The bill seeks to reduce racial disparities in traffic enforcement while promoting traffic safety. Bill No. 12-23, Montgomery County Council (Feb. 28, 2023) ("STEP Act") (proposed Montgomery County Code § 35-27(a)). The STEP Act would make two major changes to MCPD officers' traffic enforcement authority. First, it would designate several offenses under the Motor Vehicle Law as secondary offenses, beyond those already identified as secondary by the Vehicle Law itself. *Id.* (proposed § 35-27(c), (d)). Second, it would limit the ability of MCPD officers to request consent to search during traffic stops. *Id.* (proposed § 35-27(e)). The bill would also impose reporting requirements and prohibit collective bargaining over the subjects it covers. *Id.* (proposed §§ 33-80, 35-28). There is an express severability clause. *Id.* (proposed § 35-29).

The secondary-offense provisions are found in proposed new sections § 35-27(c) and (d) of the Montgomery County Code. The STEP Act would designate as a secondary offense: Any offense under Title 13 of the Transportation Article, relating to vehicle titles, registration, and license plates; any offense under Title 16, relating to driver's licenses; any offense under Title 17, relating to required insurance; fourteen enumerated provisions of Title 22, relating to vehicle equipment;[8] and §§ 21-203(c) and 21-503,

---

[8] Specifically: driving a vehicle in an unsafe condition or with improper equipment (§ 22-101(a)); driving without headlights in low-visibility conditions (§ 22-201.1); driving without headlights while operating windshield wipers due to low visibility (§ 22-201.2) (which is already a secondary offense under State law); driving a vehicle that does not have at least two headlamps (§§ 22-203(b) and 22-226(a)); driving a vehicle that does not have the rear license plate illuminated

which prohibit jaywalking (collectively, the "covered provisions"). STEP Act (proposed § 35-27(c)). The covered provisions together accounted for around 10–20% of all traffic stops by the MCPD in 2021.[9] If the STEP Act were enacted, an MCPD officer could not "stop or detain a person operating a motor vehicle, solely for a suspected violation of" one of the covered provisions. *Id.*

Under the STEP Act, an officer could still issue a citation for a secondary offense (under one of the covered provisions) after stopping a driver for a primary offense. Even then, however, an officer could not cite a driver for a first violation of one of the covered provisions but rather would be required to give a verbal or written warning. STEP Act (proposed § 35-27(d)).

The second major topic of the STEP Act is searches during traffic stops—specifically, officers' ability to request consent to search. Under the bill, an officer conducting a traffic stop could "only ask for permission to conduct a consent search of a person or vehicle if reasonable suspicion or probable cause for a criminal offense arises during the stop."[10] STEP Act (proposed § 35-27(e)).

---

(§ 22-204(f)); driving a vehicle with inadequate stop lamps or turn signal lamps (§§ 22-206 and 22-219(a)); driving a vehicle that does not have lamps of the required colors (§ 22-209); driving a vehicle that does not have required rear reflectors (§ 22-210(c)); driving a vehicle with lamps that project "glaring or dazzling light" (§ 22-219(g)); using high beams when approaching another vehicle (§ 22-223); driving a vehicle with window obstructions (§ 22-404(a)); and driving a vehicle without safety glass or with window tints that are too dark (§ 22-406). The bill clarifies that notwithstanding the bill's designation of various headlight-related offenses as secondary, an officer would still be able to stop a vehicle that does not have at least one front and rear light illuminated. STEP Act (proposed § 35-27(c)(2)(O)).

[9] In 2021, violations of Title 13 (registration and license plates) accounted for 9.08% of all traffic stops by the MCPD; violations of Title 16 (driver's licenses) for 1.72%; and equipment violations under Title 22 for 10.19% (although the data lump all equipment violations together, so there is no data on the number of traffic stops for the specific Title 22 provisions covered by the STEP Act). *See* Data Dashboard (enter "Montgomery County Police Department" for "Agency" and "2021" for "Year"). There was no data on traffic stops under Title 17.

[10] The STEP Act would also provide that an officer may not extend a traffic stop beyond its original purpose unless there is reasonable suspicion of another crime. STEP Act (proposed § 35-27(e)(1)). Other than eliminating consent as a basis for extending a stop, this is consistent with what the Fourth Amendment and Article 26 already require. *See Ferris*, 355 Md. at 372.

The STEP Act would thus eliminate "investigatory" traffic stops in which an officer requests consent to search for evidence of crimes beyond the motor vehicle offense that authorized the stop, without particularized suspicion of the driver or vehicle at issue. *See* OLO Report at 77. This rule would apply to all MCPD traffic stops, not just traffic stops where a secondary offense is involved. *See* STEP Act (proposed § 35-27(e)).

The STEP Act limits its coverage to the MCPD. It would not affect traffic stops by the State Police, municipal police, and other law enforcement agencies. STEP Act (proposed § 35-26(a)) (defining "police officer" as "a sworn officer employed by the County"). An officer conducting a traffic stop or search in violation of the STEP Act would be subject to discipline. *Id.* (proposed § 35-27(f)).

## II
## Analysis

You have asked whether the Maryland Vehicle Law would preempt the proposed STEP Act. Preemption occurs when State law precludes a local government from enacting a measure that would otherwise be within the local government's power. Preemption may result from the express terms of a State statute, may be implicit in the comprehensiveness of a State statute's coverage, or may occur when a local law directly conflicts with State law. *See, e.g.*, 101 *Opinions of the Attorney General* 35, 55 (2016). As we will explain, the Maryland Vehicle Law expressly preempts local governments from making law on any subject the Vehicle Law covers. And the Vehicle Law covers the subject of primary versus secondary offenses: it establishes a default rule of primary enforcement by empowering officers to issue a citation for any Vehicle Law offense, while mandating secondary enforcement for some specific offenses. Because the General Assembly has addressed the issue, local legislation cannot make different determinations on which traffic offenses should be primary and which secondary. But because the Vehicle Law says nothing about searches during traffic stops, it would not preempt the STEP Act's limitations on consent searches. Nor would those limitations on searches conflict with any provision of the Vehicle Law.

## A. *General Principles of Preemption*

Montgomery County has adopted the charter home rule form of government. *See generally* Md. Const., Art. XI-A. This status grants the county broad authority to enact local laws. *See, e.g.*,

*Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 160-62 (1969). But a charter county's power has limits. Even a local law that is otherwise within the county's power must yield if State law preempts it. *See, e.g.*, *Edwards Sys. Tech. v. Corbin*, 379 Md. 278, 296-97 (2004).

State law can preempt local law in one of three ways. *E.g.*, *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 512 (2004). First, express preemption occurs when a State statute explicitly precludes local governments from making law in a certain area. 98 *Opinions of the Attorney General* 60, 88 (2013). We interpret express preemption provisions under the normal rules of statutory construction. *See, e.g.*, 75 *Opinions of the Attorney General* 308, 311-12 (1990). Under those rules, our primary objective is to determine and effectuate the intent of the General Assembly, beginning with the ordinary meaning of the language used, considered in context, and considering other sources of meaning, such as legislative history and the statute's general purpose. *E.g.*, 107 *Opinions of the Attorney General* 196, 203 (2022).

The second form of preemption is implied preemption. "State law can preempt local ordinances by implication when 'the ordinance deals with an area in which the General Assembly has acted with such force that an intent to occupy the entire field must be implied.'" *Board of County Comm'rs v. Perennial Solar, LLC*, 464 Md. 610, 619 (2019) (quoting *Howard County v. Potomac Elec. Power Co.*, 319 Md. 511, 522 (1990)). But a statute with an express preemption provision is unlikely to *implicitly* preempt, in this way, more than it *expressly* preempts. *See Browning-Ferris, Inc. v. Anne Arundel County*, 292 Md. 136, 153 (1981); *see also* 107 *Opinions of the Attorney General* 74, 83-84 (2022) (discussing this point in the context of federal-state preemption).

Third, conflict preemption occurs when a local law directly conflicts with State law. Maryland courts have recognized two sub-types of conflict preemption. First, a "verbal" conflict, also known as "prohibit-permit" conflict, exists when the local law would authorize something State law prohibits or would prohibit something State law expressly authorizes. 98 *Opinions of the Attorney General* at 91; *Worton Creek*, 381 Md. at 513. Second, a "functional" conflict exists when the impact of the local law

interferes with the State law's function. 96 *Opinions of the Attorney General* 139, 144 (2011).[11]

## B. The STEP Act's Secondary-Offense Provisions

We first consider whether the Vehicle Law would preempt the STEP Act's secondary-offense provisions. Under the Vehicle Law, a local government may not "make or enforce any local law, ordinance, or regulation on any subject covered by the Maryland Vehicle Law" except as expressly authorized. TR § 25-101.1(b)(3); *accord* TR § 25-101.1(c)(1). Our Office has described this provision as representing "some of the most far-reaching preemption in State law." Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Brooke E. Lierman, at 1 (Oct. 10, 2018); *see also* 93 *Opinions of the Attorney General* 126, 134 (2008) (characterizing the Vehicle Law's express preemption provision as especially "open-ended").

To determine whether the Vehicle Law preempts a local law under § 25-101.1, we must answer three questions: First, is the local measure at issue a "local law, ordinance, or regulation"? Second, does it address a "subject covered by the Maryland Vehicle Law"? Third, does any other State law "expressly authorize[]" the measure? If the measure is a "local law, ordinance, or regulation" on a "subject covered by the Maryland Vehicle Law," and no other State law expressly authorizes it, the local enactment is preempted.

Answering the first question is straightforward: if enacted by the County Council, the STEP Act would clearly be a "local law" or "ordinance" within the meaning of TR § 25-101.1. The other two questions require more detailed analysis.

### 1. Subject Covered by the Maryland Vehicle Law

As to the second question, our opinion is that the STEP Act's secondary-offense provisions address a "subject covered by the Maryland Vehicle Law": the determination of which motor vehicle offenses are primary and which are secondary.

---

[11] Federal law also recognizes "obstacle" or "frustration of purpose" preemption, when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *E.g.*, *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). But Maryland courts have so far declined to import this doctrine into the State versus local law context. *E.g.*, *County Council of Prince George's County v. Chaney Enters. Ltd. P'ship*, 454 Md. 514, 541 n.19 (2017).

Several of our prior opinions have considered whether particular local laws addressed subjects covered by the Vehicle Law. For example, in one opinion, we concluded that when State law required minors (and only minors) to wear motorcycle helmets, Baltimore City could not impose the same requirement on adults, because the Vehicle Law covered the subject of "safety equipment required of motorcycle operators," 65 *Opinions of the Attorney General* 483, 484, 486-87 & n.7 (1980). Later, our Office concluded in a different opinion that a city ordinance could address charitable and employment solicitations from sidewalks, from vehicles, and in parking lots, where the Vehicle Law addressed only solicitation by pedestrians standing in the roadway. 93 *Opinions of the Attorney General* 31, 33, 36-37 (2008). Another opinion concluded that a city could regulate parking on private property *with* the property owner's consent because the Vehicle Law only regulates parking on private property *without* the property owner's consent. 73 *Opinions of the Attorney General* 252, 254-55 (1988).[12]

As these opinions illustrate, the level of generality at which the Vehicle Law's preempted "subjects" should be defined is not always clear. Our 2008 opinion on roadway solicitation, for example, would presumably have reached the opposite result if we had defined the covered "subject" as solicitation in a roadway rather than solicitation *by pedestrians* in a roadway; this would have preempted the local ban on solicitation from vehicles. Similarly, our 1980 opinion on motorcycle helmets would likely have reached the opposite result if it had defined the covered subject as "motorcycle safety equipment *required of minors*," thereby saving Baltimore City's adult helmet requirement from preemption.

Even though it may not always be clear how broadly (or narrowly) to define the "subjects" covered by the Vehicle Law, it *is* clear that when a local law addresses a matter that specific provisions of the Vehicle Law also directly address, the local law

---

[12] In *Mayor & City Council of Baltimore v. Hart*, 395 Md. 394 (2006), Maryland's highest court held that the Vehicle Law did not preempt a Baltimore City Police Department general order setting rules for emergency vehicles that were stricter than State law, *id.* at 406. However, for reasons that are not clear from the opinion or briefing, the question of *express* preemption under TR § 25-101.1 was not presented in *Hart*. *See id.* at 406-10 (discussing conflict preemption only). It is also possibly relevant that *Hart* involved a departmental order rather than a "local law, ordinance, or regulation." *See id.* at 404; *see also infra* Part II.B.3.

will be preempted. The level of generality problem has arisen only when a local law has addressed something that the Vehicle Law does *not* directly address—such as motorcycle helmets for adults or solicitation from cars—but that was arguably related to, and thus possibly part of the same broader "subject" as, a matter the Vehicle Law did address. But there is no question that the Vehicle Law would preempt a local law on a subject the Vehicle Law directly speaks to. *See, e.g.*, 58 *Opinions of the Attorney General* 462, 464 (1973) (concluding that a local ordinance, intended to prevent debris from falling off trucks, was preempted because the Vehicle Law also had a provision requiring the securing of truck loads).

Here, the Vehicle Law directly addresses which offenses are primary and which are secondary through a rule that applies to all offenses under the Vehicle Law. More specifically, § 26-201 of the Transportation Article establishes that an officer may issue a citation for a violation of any Vehicle Law provision, if the officer has probable cause to believe the person has committed or is committing the violation. TR § 26-201(a). The General Assembly added this provision in 1977 to make explicit a power that had previously been implicit. 1977 Md. Laws, ch. 186; Commission to Revise the Annotated Code, Report on S.B. 501, 1977 Leg., Reg. Sess., at 4 (Feb. 22, 1977). Although the statute refers only to citations and not explicitly to traffic stops, the authority to issue a citation for a motor vehicle offense implies the authority to make a traffic stop, because the statute requires that the citation be issued to and acknowledged by the driver. *See* TR §§ 26-201(b), 26-203. And more importantly, by authorizing an officer to issue a citation for any motor vehicle offense without regard to whether another offense has been committed, TR § 26-201 provides for primary enforcement of all motor vehicle offenses. If an officer can cite a driver for a given offense, without more, that offense is necessarily primary. The Vehicle Law thus addresses the subject of primary versus secondary enforcement of the motor vehicle laws by establishing a general rule of primary enforcement.

As exceptions to that general rule, the General Assembly has expressly designated some specific motor vehicle violations as secondary. *See, e.g.*, TR § 21-1104(c)(3) (driving with an object hanging from the rearview mirror); TR § 13-411(c)(2) (driving with a frame or border partially obscuring the license plate); *see also supra* Part I.C (listing other examples). Typically, an officer may enforce one of these provisions only after stopping a driver for a suspected violation of a different provision. *E.g.*, TR § 21-1104(c)(3)(ii). So, for example, an officer could not stop or cite a driver who was driving with an object hanging from the

rearview mirror but otherwise obeying the law. If the driver then ran a red light, however, an officer could stop the driver and cite them for both offenses. The General Assembly's express categorization of certain offenses as secondary confirms that the Vehicle Law covers the subject of which motor vehicle offenses are primary and which are secondary. Reading the Vehicle Law as a whole, as we are required to do, *e.g.*, 105 *Opinions of the Attorney General* 3, 16 (2020), these secondary-offense provisions are best read as exceptions to the general rule of primary enforcement established by TR § 26-201.

Indeed, under standard principles of statutory interpretation, the General Assembly's establishment of these specific exceptions indicates an intent that the general rule should apply in all cases not expressly excepted. *See, e.g.*, 85 *Opinions of the Attorney General* 80, 83 (2000) (noting that "exceptions are strictly construed"); *Leppo v. State Highway Admin.*, 330 Md. 416, 423 (1993) ("When the legislature has expressly enumerated certain exceptions to a principle, courts normally should be reluctant thereafter to create additional exceptions." (quoting *Ferrero Constr. Co. v. Dennis Rourke Corp.*, 311 Md. 560, 575 (1988)); *Department of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 668 (1967) ("By making these two items the sole exceptions, the statute is as plain as if it had listed all of the [items] not included in the exceptions."). And, consistent with that understanding, where the General Assembly has chosen to make particular offenses secondary, the legislative history of those enactments expressly recognized that "[e]xcept as otherwise specified, violations of the Maryland Vehicle Law are subject to primary enforcement." Fiscal & Policy Note, H.B. 1335, 2017 Leg., Reg. Sess., at 1; *accord* Fiscal & Policy Note, S.B. 859, 2020 Leg., Reg. Sess., at 2 (same). Thus, read as a whole, the Vehicle Law addresses the subject of primary versus secondary enforcement: it establishes a rule that, unless the Vehicle Law has expressly designated a motor vehicle offense as secondary, the offense is subject to primary enforcement.

Especially illustrative are the instances where the General Assembly has redesignated a formerly primary offense as secondary. 2020 Md. Laws, ch. 107 (frame or border partly obscuring license plate); 2017 Md. Laws, ch. 756 (object hanging from rearview mirror). In each of these cases, a major purpose of the change was to reduce racially disparate traffic enforcement. *Hearing on H.B. 200 Before the House Env't & Transp. Comm.*, 2020 Leg., Reg. Sess., at 1:08:10-1:09:50 (Feb. 13, 2020) ("H.B. 200 Hearing") (statement of Del. Fisher); *Hearing on H.B. 1335 Before the House Env't & Transp. Comm.*, 2017 Leg., Reg. Sess.,

at 2:29:40-2:30:30 (Mar. 9, 2017) ("H.B. 1335 Hearing") (statement of Del. Wilkins). But, in each case, the Legislature chose to establish secondary enforcement for only some of the conduct the provision covered and keep primary enforcement for the rest. As to license plates, for instance, the Legislature provided secondary offense status only for objects obscuring the frame or border of a license plate and left primary enforcement in place for material covering the actual plate number. *See* 2020 Md. Laws, ch. 107. Similarly, as to windshield obstruction, the General Assembly downgraded driving with material hanging from the rearview mirror to a secondary offense, while retaining primary enforcement for other instances where an object obstructs a driver's view through the windshield. *See* 2017 Md. Laws, ch. 756.

In other instances, legislative proposals to make particular offenses secondary have failed. For example, when the General Assembly in 2009 passed legislation to prohibit texting while driving, *see* 2009 Md. Laws, ch. 194 (enacting TR § 21-1124.1), the Senate rejected a proposed floor amendment that would have made texting while driving a secondary offense, *see* Amend. No. 463122/1, S.B. 98, 2009 Leg., Reg. Sess., with the understanding that if the amendment were rejected the offense would be primary, *see* Senate Floor Proceedings No. 43, 2009 Leg., Reg. Sess., at 23:00-23:48 (Mar. 13, 2009) (statement of Sen. Zirkin). This further supports the view that the Vehicle Law establishes a general rule of primary enforcement for motor vehicle offenses and that preservation of that general rule, for offenses not explicitly declared secondary, is intentional on the part of the Legislature. Balancing the benefits and costs of secondary enforcement for a given offense is a policy judgment, and the Vehicle Law's express preemption provision reserves that policy judgment to the General Assembly.

Perhaps if the Vehicle Law *only* designated certain offenses as secondary, and was otherwise silent as to how the traffic laws are to be enforced, the case for preemption would be weaker. But the combination of the general rule allowing police officers to cite drivers for any Vehicle Law offense—which indicates that such offenses are generally subject to primary enforcement—and the specific exemptions for situations where the Legislature has determined secondary enforcement to be appropriate, causes us to conclude that the Maryland Vehicle Law covers the subject of primary versus secondary enforcement of motor vehicle offenses. Thus, a local law may not address that subject absent express authorization by the General Assembly.

### 2.   *Express Authorization by Other State Law*

The third question under the Vehicle Law's express preemption provision is whether, even if the STEP Act's secondary-offense provisions involve a subject covered by the Vehicle Law, there is nonetheless a separate express authorization for local governments to legislate on that subject. The Vehicle Law does, alongside its broad preemption provision, expressly reserve certain powers to localities. TR § 25-102(a). We thus need to consider whether any of those powers would authorize the STEP Act's secondary-offense provisions.

The list of enumerated local powers in § 25-102(a) dates back to 1943. Before that year, the Vehicle Law had contained— alongside the general preemption provision enacted in 1927—a provision authorizing local governments to promulgate "reasonable traffic regulations." Md. Ann. Code, Art. 56, § 145 (1939). As part of its 1943 revision to the Vehicle Law, which sought to "promot[e] greater uniformity," 1942 Report at 8, the General Assembly repealed that broad power. *See* 1943 Md. Laws, ch. 1007. In its place, the Legislature enacted a list of six specific local powers (copied almost verbatim from the 1938 Uniform Vehicle Code) and provided that the Vehicle Law "shall not be deemed to prevent local authorities" from exercising those powers. *Compare* 1943 Md. Laws, ch. 1007 (enacting Art. 66 ½, § 135), *with* Uniform Vehicle Code, Uniform Act Regulating Traffic on Highways § 28, at 5 (1938 rev.).[13]

One of the reserved powers is "regulating or prohibiting the *stopping*, standing, or parking of vehicles." TR § 25-102(a)(1) (emphasis added). On its face, this provision might appear to cover traffic "stops" by police. But "stop" is a defined term under the

---

[13] The six local powers enumerated in 1943 were: "(1) Regulating the standing or parking of vehicles; (2) Regulating traffic by means of police officers or traffic control devices; (3) Regulating or prohibiting processions or assemblages on the highways; (4) Designating particular highways as one way highways and requiring that all vehicles thereon be moved in one specific direction; (5) Regulating the speed and weight of vehicles in public parks; (6) Designating any intersection as a stop intersection requiring all vehicles to stop at one or more entrances to such intersections." 1943 Md. Laws, ch. 1007 (enacting Art. 66 ½, § 135). These provisions are now codified, with minimal changes, at TR § 25-102(a)(1)-(6). The General Assembly has since added further items to the list, but the new items are not substantially different in character from the original six; all essentially relate to the control of traffic on roads under the local government's jurisdiction. See TR § 25-102(a).

Vehicle Law, TR § 11-162, and when used in a "prohibitory sense"—the sense in which § 25-102(a)(1) uses it—the term "stop" excludes instances where a vehicle stops "in compliance with the directions of a police officer," TR § 11-162(2). Also, the context in which the word "stopping" is used in § 25-102(a)(1)—together with "standing" and "parking"—implies that the provision is concerned with where and when a driver may stop or park their vehicle safely, not with officer-initiated traffic stops. *See Shivers v. State*, 256 Md. App. 639, 664 (2023) (noting that in statutory interpretation "the meaning of a word is or may be known from the accompanying words" (quoting *Emmert v. Hearn*, 309 Md. 19, 25 (1987)).

The provision's history accords with that understanding. Section 25-102(a)(1) originally omitted the word "stopping," even though that word had appeared in the Uniform Vehicle Code provision on which the Maryland provision was modeled. *Compare* 1970 Md. Laws, ch. 534 (enacting Art. 66 ½, § 15-102(a)(1)), *with* Uniform Vehicle Code § 15-102(a)(1), at 230 (1968 rev.). The word "stopping" was added seven years later during the code revision process to correct this "oversight." 1977 Md. Laws, ch. 14 (Revisor's Note to TR § 25-102). Because the code revision process generally is not intended to make substantive changes to the law, this history implies that the General Assembly did not see the addition of "stopping" alongside "standing" and "parking" as changing the scope of the power. *See, e.g.*, *Comptroller v. Blanton*, 390 Md. 528, 538-39 (2006).

Local governments also have the power of "[r]egulating traffic by means of police officers or traffic control devices." TR § 25-102(a)(2). This provision, in our view, recognizes that local governments may employ police officers to direct traffic and control the movement of vehicles on the roadway, as necessary to ensure safe and efficient traffic flow. But we do not think it empowers local authorities to revise the General Assembly's determination on whether a traffic offense is primary or secondary.

To begin, we note that the provision speaks of "regulating *traffic*." "Traffic" means the physical movement of vehicles on a highway. *See* TR § 11-166. So "regulating traffic" most naturally means *directing* traffic, i.e., controlling the movement of vehicles and traffic flow. The provision recognizes that local governments may regulate traffic in two ways—"by means of" either police officers or traffic control devices, TR § 25-102(a)(2), with the latter referring to traffic lights, stop signs, and the like, TR § 11-167. This, again, suggests that § 25-102(a)(2) contemplates police

officers acting in a role similar to a traffic light or stop sign—directing traffic in the ordinary course of its movement. The other provisions enacted alongside § 25-102(a)(2) in 1943 similarly relate to the control of physical traffic movement, akin to the placement of traffic signals, such as designation of a street as a one-way street or of an intersection as a four-way stop. *See* 1943 Md. Laws, ch. 1007. As Maryland courts often say, "the meaning of the plainest language is controlled by the context in which it appears." *E.g.*, *Elsberry v. Stanley Martin Cos.*, 482 Md. 159, 181 (2022) (quoting *Building Materials Corp. of Am. v. Board of Educ.*, 428 Md. 572, 585 (2012)). Here, the context indicates that § 25-102(a)(2)'s reference to "regulating traffic by means of police officers" addresses what it seems, at first glance, to address—local authority to have police officers control and direct traffic movement.

But even if § 25-102(a)(2)'s coverage is broader than just that, we cannot identify a reading of that provision that is both broad enough to encompass the authority to redesignate primary offenses as secondary and also consistent with the provision's text, context, and history. That is, we doubt that the General Assembly intended to enable localities to alter the legislative judgment that "[e]xcept as otherwise specified, violations of the Maryland Vehicle Law are subject to primary enforcement." *E.g.*, Fiscal & Policy Note, H.B. 1335, 2017 Leg., Reg. Sess. at 1. A police officer's statutory authorization to issue a citation for any Maryland Vehicle Law offense, except those explicitly designated as secondary offenses by the General Assembly, reflects that general rule of primary enforcement. *See* TR § 26-201. Again, we interpret statutory schemes, as far as possible, to form a harmonious whole. *E.g.*, *Lockshin v. Semsker*, 412 Md. 257, 276 (2010). For example, in a prior opinion, we concluded that even though local governments have the express authority to regulate parking, they cannot adopt procedures for handling parking violations that differ from the procedure in State law. 78 *Opinions of the Attorney General* 263, 264-65 (1993). Here, too, we think the exercise of any power under § 25-102(a)(2) must be consistent with the overall statutory scheme of the Vehicle Law.[14]

---

[14] Our reading of § 25-102(a)(2) is also consistent with the principle that a statute should be construed so that none of its language "is rendered surplusage, superfluous, meaningless, or nugatory." *E.g., Rowe v. Maryland Comm'n on Civil Rights*, 483 Md. 329, 342 (2023) (quoting *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006)). In particular, § 25-102(a)(1) and § 25-102(a)(2) address distinct topics under our

Authority from other jurisdictions supports our view as well. As noted above, § 25-102(a)(2)'s language comes from the Uniform Vehicle Code. Other states have interpreted their parallel provisions consistent with our view that § 25-102(a)(2) authorizes localities to use police to regulate the movement of traffic in accordance with law but not to alter the rules of traffic enforcement themselves. For example, the Minnesota Supreme Court held that the effect of a provision with near-identical language "is only to authorize a city to direct the movement of vehicles on the roadway." *State v. Kuhlman*, 729 N.W.2d 577, 582 (Minn. 2007); *see also id.* at 582-84 (holding that state law preempted city attempt to authorize red light cameras). Similarly, the Florida Supreme Court in *Masone v. City of Aventura*, 147 So.3d 492, 497 (Fla. 2014), concluded that the purpose of its own parallel statutory language was to allow local governments to control the movement of traffic but not to alter the statutory rules of traffic enforcement. In contrast, we know of no jurisdiction that has interpreted this provision to authorize a locality to redesignate a primary traffic violation as secondary.

### 3. *The Role of Enforcement Discretion*

One might argue that our conclusion clashes with the enforcement discretion normally vested in police departments and,

---

interpretation: § 25-102(a)(1) covers rules for where drivers can stop or park their vehicles, and § 25-102(a)(2) deals with the control of active traffic flow by official authority, namely officers or traffic signals. One might also argue that, unless § 25-102(a)(2) authorizes some subject matter that would *otherwise* be preempted, § 25-102(a)(2) serves no purpose. But the provisions of § 25-102(a) may have been intended primarily for the avoidance of doubt, that is, to eliminate any suggestion that the listed subjects are preempted. Indeed, § 25-102(a) seems to cover at least some matters that would not have been preempted even absent § 25-102(a)'s enactment. For example, § 25-102(a)(12) authorizes localities to "[a]dopt[] any other traffic regulations as specifically authorized in the Maryland Vehicle Law," which (because it merely refers to authorization granted elsewhere) would necessarily be surplusage under a strict application of the canon. Finally, it is an equally well-established rule of statutory interpretation that interpreters should neither "add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute," nor should they "construe a statute with forced or subtle interpretations that limit or extend its application." *E.g.*, *Rowe*, 483 Md. at 342 (quoting *Lockshin*, 412 Md. at 275). As we have explained, § 25-102(a)(2) speaks only to "regulating traffic," and we think it would require a "forced" interpretation to stretch that language to encompass the designation of traffic violations as primary or secondary.

thus, in the local governments that employ those police departments. No police department enforces all of the traffic laws all of the time—as anybody who has driven on a highway knows from observing that the speed of traffic is usually five or ten miles per hour above the speed limit. Generally, the decision whether to stop or detain a driver for a motor vehicle offense is a matter of the individual officer's discretion, even when the officer has observed a probable violation. *See Ashburn v. Anne Arundel County*, 306 Md. 617, 624 (1986). Indeed, current departmental policy of the MCPD explicitly grants officers "discretion in the enforcement of traffic laws" and states that "[a] written warning is appropriate . . . where a minor equipment defect is apparent." MCPD, FC No. 1000, *Traffic Management System*, § VIII(A)-(B) (July 1, 2022).

It also seems clear that a local government generally has authority to set internal operating rules for its own agencies, including the local police department. "The authority to establish a police force would be futile if it did not carry with it, at least by implication, the authority to enact reasonable rules for the effective administration of the force . . . ." 16A *McQuillin: The Law of Municipal Corporations* § 45:14 (3d ed., June 2023 update). The question arises, then, why a local legislative body cannot adopt something akin to the STEP Act as a way of setting rules for the exercise of enforcement discretion for its own local police department.

It may well be that, as a general matter, the County Council could by ordinance set enforcement priorities for the county police department. But whatever legislative authority the County Council might possess is overridden in this specific area by the General Assembly's decision to preempt "local law[s]" and "ordinance[s]" addressing "subject[s]" covered by the Vehicle Law. TR § 25-101.1(b)(3). In this particular area of motor vehicle law—that is, whether an offense is primary or secondary—the Legislature has decided as a policy matter that the need for statewide uniformity outweighs local governments' legislative autonomy. *See* 65 *Opinions of the Attorney General* at 486. Simply put, then, the County Council may not legislate on a subject the General Assembly has fenced off, even when it would have full power to act but for the preemption statute. *See* 101 *Opinions of the Attorney General* at 55-57 (concluding that preemption limits a county governing body's power to place conditions on appropriations in the context of public library funding).

We also express no opinion about whether the county police department could adopt, on its own authority, an internal policy

resembling the STEP Act. The MCPD currently has internal policies, issued by the Chief of Police, on a variety of subjects. *See generally* MCPD, *Department Policies*, https://www.montgomery countymd.gov/pol/resource/policies.html (last visited Sept. 13, 2023). Express preemption under TR § 25-101.1 applies only to a "local law, ordinance, or regulation," and there is at least a question as to whether an executive branch agency's internal policy, which is subject to change at any time and merely communicates how the agency plans to exercise its discretion, would qualify as a local law, ordinance, or regulation, especially when the policy might not need to be promulgated as a formal regulation under the applicable administrative procedure statute. *Cf.* Montgomery County Code § 35-3(c) (indicating that county administrative procedure law governs the adoption of police "regulations" but not "orders"). In any event, we need not decide whether a police department could adopt such a policy to answer the question that you have asked. We conclude only that a local legislative body may not designate a traffic offense as secondary when State law has not done so.[15]

## C. The STEP Act's Consent-Search Provision

The STEP Act would also prohibit an MCPD officer from requesting consent to search, during a traffic stop, unless reasonable suspicion or probable cause "arises during the stop." STEP Act (proposed § 35-27(e)(2)). For the reasons explained below, the Vehicle Law's express preemption provision would not cover this aspect of the STEP Act, because the Vehicle Law does not address the conditions under which an officer may search a vehicle, or its occupants, during a traffic stop. Nor does the Vehicle Law establish implied field preemption beyond the scope of its express preemption clause. And a restriction on searches during stops would not conflict with any provision of the Vehicle Law. Accordingly, the Vehicle Law would not preempt the STEP Act's consent-search provision.[16]

---

[15] Because we conclude that the STEP Act's secondary-offense provisions would be expressly preempted, we need not consider whether they would be subject to implied or conflict preemption.

[16] Your opinion request asked only whether the Vehicle Law would preempt the STEP Act. We thus limit our preemption analysis to the Vehicle Law. We also note that the STEP Act's provision precluding collective bargaining on the matters covered by the STEP Act (proposed § 33-80) would not be preempted by the Vehicle Law for similar reasons to those discussed here: the Vehicle Law does not address collective bargaining or require collective bargaining on any particular topic, so no form of preemption would apply.

### 1.  *Express Preemption*

As we have explained, express preemption under the Vehicle Law applies only when a local law, ordinance, or regulation addresses a "subject covered by the Maryland Vehicle Law." TR § 25-101.1(b)(3). Although the Vehicle Law's enforcement provisions cover procedures for citation, arrest, and prosecution for motor vehicle offenses, *see generally* TR §§ 26-201 to 26-412, nothing in the Vehicle Law prescribes the circumstances under which an officer may, or may not, conduct a search during a traffic stop or otherwise. In short, the Vehicle Law is not the source of an officer's authority to search.[17] Thus, the Vehicle Law does not expressly preempt a local law limiting a local police department's authority to conduct searches, because searches are "altogether beyond the purview of the Vehicle Law." *See* 71 *Opinions of the Attorney General* 400, 404 (1986) (concluding that the Vehicle Law does not address speed bumps).

### 2.  *Implied Preemption*

Implied preemption occurs when the "General Assembly has acted with such force that an intent to occupy the entire field must be implied." *Perennial Solar*, 464 Md. at 619. But we do not think the Vehicle Law implicitly preempts a field broader than its express preemption provision. In other words, if a local law is not subject to the Vehicle Law's express preemption provision, it is likely not subject to implied preemption either. Normally, when the General Assembly specifies the items to which a law will apply, we will infer that the exclusion of other items was intentional. *See* 98 *Opinions of the Attorney General* 3, 12 (2013) (discussing the canon of construction *expressio unius est exclusio alterius*, or "the expression of one thing is the exclusion of another"). That principle applies to preemption as well. When the General Assembly has drafted an express preemption provision, it is usually a reasonable inference that the Legislature considered the breadth of the field it wanted to preempt and that the express preemption provision corresponds to that intent. *See Browning-Ferris*, 292 Md. at 153 (holding that the enactment of a narrower express preemption provision overrode what had been "a very strong case" for broader implied preemption). Although we do not foreclose the possibility that legislative intent could indicate implied preemption extending beyond the bounds of express preemption within the

---

[17] TR § 25-113 requires law enforcement agencies to gather certain data on searches during traffic stops and to adopt a policy against race-based traffic stops that does not affect an officer's otherwise existing authority to search, but it does not, itself, grant authority to search.

context of a particular statutory scheme, we see no evidence of such an intent here. The Vehicle Law therefore would not implicitly preempt the STEP Act's consent-search provision.

### 3. Conflict Preemption

Conflict preemption is the third and final form of preemption Maryland law recognizes. The first type of conflict preemption, and the one Maryland courts most frequently consider, is "verbal" or "prohibit-permit" conflict. Under this type of conflict preemption, local law may not permit what State law prohibits, nor may local law prohibit what State law affirmatively permits. *See Mayor & City Council of Baltimore v. Sitnick*, 254 Md. 303, 317 (1969). There is no preemption if State law permits something simply by not addressing it; rather, State law must affirmatively authorize an activity before a local law prohibiting that activity will be preempted. *Coalition for Open Doors v. Annapolis Lodge No. 622, Benevolent & Protective Order of Elks*, 333 Md. 359, 380 (1994). As we have discussed, the Vehicle Law is silent on searches; it neither prohibits them, nor expressly permits them. Accordingly, there would be no verbal conflict between the Vehicle Law and a local prohibition on consent searches.

The second type of conflict preemption is "functional conflict." The courts have not been as clear about what a functional conflict involves. But, "[i]n general, some element of irreconcilability or legal inconsistency is required, such that both the State and local laws cannot be applied together." 93 *Opinions of the Attorney General* at 135. We see no inconsistency or irreconcilability between the Vehicle Law and the STEP Act's consent-search provisions.

The consent-search provision would not create a problem analogous to any of the situations where courts have found functional conflicts. *See Coalition for Open Doors*, 333 Md. at 380 n.39 (citing functional conflict cases). First, the consent-search provision would not create a situation where there would be conflicting rules in the same area such that a police officer could not simultaneously comply with State and local law. *See Montgomery County v. Board of Supervisors of Elections*, 311 Md. 512, 517 (1988) (finding functional conflict when State and local law provided irreconcilable methods of appointing the same officers). The provision also would not prohibit a local government from taking action that is required under State law. *See East v. Gilchrist*, 296 Md. 368, 373-74 (1983) (finding functional conflict where local charter prohibited county from spending

money that State law required it to spend). Nor would it create a "direct conflict with a State statute regulating the same matter," *Worton Creek*, 381 Md. at 514 (discussing *Montgomery County Bd. of Realtors v. Montgomery County*, 287 Md. 101, 109-10 (1980), in which the Court held that a local tax conflicted with the State's scheme for assessment of real property), because, again, the Vehicle Law does not regulate searches.

We have also suggested that a functional conflict may exist when a local law interferes with the functioning of a State law. *See* 98 *Opinions of the Attorney General* at 91. We would be cautious about finding a functional conflict on this basis alone, given that Maryland courts have repeatedly declined to adopt the similar federal doctrine of obstacle preemption, under which a law is preempted if it frustrates the purpose of a federal statute. *E.g., Chaney*, 454 Md. at 541 n.19. But even assuming State law can preempt local law in this way as a general matter, this is not such a case.

The purpose of the Vehicle Law is to ensure the safe and efficient movement of traffic, and to prevent crashes and injuries on roadways. *Supra* Part I.B. By contrast, the functional effect of the consent-search provision of the STEP Act is to limit an officer's authority to search an already-stopped vehicle. Because these provisions of the Act would only limit what an officer can do once the vehicle has already been stopped, their impact on traffic enforcement would be minimal—given that traffic violations are meant to be observable before the vehicle has been stopped. When an officer seeks consent to search a stopped vehicle, despite lacking any particularized suspicion of a crime, their purpose is usually not to enforce the traffic laws but to search for evidence of other crimes, like possession of contraband. *See, e.g.*, LaFave, *supra*, at 1891-92. Perhaps there might be some circumstances where evidence of a motor vehicle offense could only be revealed through a suspicionless consent search, but we think such cases will be rare. The STEP Act's consent-search provision thus would not interfere with the Vehicle Law's functioning to such a degree as to be preempted.

### III
### Conclusion

In our opinion, the Maryland Vehicle Law would preempt a local law, such as the STEP Act, that would designate a violation of the Vehicle Law as secondary when State law has not designated it as such. This is because the determination of which motor

vehicle offenses are primary, and which are secondary, is a subject covered by the Vehicle Law. And neither the local power to regulate "stopping, standing or parking," TR § 25-102(a)(1), nor the local power to "regulate traffic by means of police officers," TR § 25-102(a)(2), authorizes a local government to redesignate a Vehicle Law offense from primary to secondary status. On the other hand, the Vehicle Law would *not* preempt a local law limiting a local police officer's ability to request consent to search during traffic stops. Because the Vehicle Law does not address the conditions under which searches are permissible, such a local law would neither intrude on a subject covered by the Vehicle Law nor conflict with the Vehicle Law.

Anthony G. Brown
Attorney General of Maryland

Thomas S. Chapman
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice